UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL KEESEE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12 CV 1231 JAR / DDN |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Daniel Keesee for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. §§ 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the decision of the Administrative Law Judge (ALJ) be affirmed.

**I. BACKGROUND**

Plaintiff Daniel Keesee, born May 24, 1955, filed applications for Title II and Title XVI benefits on November 10, 2009. (Tr. 104-13.) He alleged an onset date of disability of August 15, 2008, due to anxiety, back and shoulder injuries, bipolar disorder,

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The Court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

depression, nerves, and sleeping problems. (Tr. 136.) Plaintiff's applications were denied initially on April 19, 2010, and he requested a hearing before an ALJ. (Tr. 53-60.)

On February 15, 2011, following a hearing, the ALJ found plaintiff not disabled. (Tr. 13-21.) On May 7, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On December 6, 2004, plaintiff complained of back pain at Jefferson Memorial Hospital and received a backache diagnosis. (Tr. 203.)

On December 8, 2004, plaintiff returned to Jefferson Memorial Hospital complaining of sharp, severe low back pain that radiated into his right leg. He stated that his pain resulted from a lifting injury four days prior. Dilaudid and Phenergan were administered.[2] X-rays of his lumbar spine revealed moderate degenerative changes and moderate disc space narrowing and osteophyte formation at L5-S1.[3] He was diagnosed with lumbago, prescribed Vicodin and Flexeril, and instructed to apply ice and rest.[4] (Tr. 199-202.)

---

[2] Dilaudid is a narcotic used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited on August 28, 2013). Phenergan is an antihistamine that can be used to improve the performance of narcotic pain relievers. Id.

[3] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 2117-18 (28th ed., Lippincott Williams and Wilkins 2006) ("Stedman").

[4] Vicodin is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited on August 28, 2013). Flexeril is used short-term to treat muscle spasms. Id.

On July 18, 2005, Adam Bogaart, D.C., examined and treated plaintiff with chiropractic manipulation. Plaintiff complained of severe low back pain that radiated into his right leg and thoracic pain and spasms. He rated his back pain as ten of ten at its worst and informed Dr. Bogaart that his low back pain had persisted for two years. He indicated that sitting or standing for long periods of time or bending backwards or to the right side exacerbated his back pain. He further informed Dr. Bogaart that heat relieved his back pain. X-rays revealed a right postural shift in the lumbar spine with the right sacroiliac joint in a posterior inferior position, a right curvature of L4 and L5, and an anterior shift in the sacrum with a mild degenerative loss of the disc space between L5 and S1. Dr. Bogaart diagnosed plaintiff with lumbar pain, lumbar segmental dysfunction, muscle spasms, and calcification of intervertebral cartilage or disc in the lumbar region. (Tr. 218-19.)

From July 22, 2009, until October 21, 2009, plaintiff received dependency treatment, individualized counseling, group counseling and education, and relapse prevention services at Southeast Missouri Community Treatment Center, Inc. Plaintiff received this treatment pursuant to a condition of his state probation as a persistent DWI offender. His substance abuse counselor noted that plaintiff showed acceptable cooperation and compliance during the treatment, was reliable in appearing, responded when prompted, and eventually was moderately sociable. Plaintiff reported the inability to return to work due to a moderately intense arthritic condition. Plaintiff's substance abuse counselor listed his prognosis as fair and further determined that plaintiff's condition had improved. (Tr. 206-07.)

On February 11, 2010, plaintiff was examined by clinical psychologist Lauretta Walker, Ph.D., upon the request of Disability Determination Services. Plaintiff reported the following. Plaintiff endured a bad childhood and feared his alcoholic father. His family frequently moved, and he dropped out of school in the tenth grade after failing freshman English twice. He has married five times. The first marriage resulted in one child and the fourth marriage resulted in two children. His most recent marriage ended

when his fifth wife died of a blood clot five years ago. Plaintiff worked at Brown Shoe for a year, a chemical plant in St. Charles for a couple of years, a steel plant in North County for five years, Tire America for five years, and most recently, as a janitor at a nursing home for six months. He quit his most recent job because his employer continued to increase his responsibilities without increasing his pay. Plaintiff's medical history consists of broken fingers and a black out when he was younger. Plaintiff additionally hurt his back while working for a steel foundry. He received treatment at the emergency room and from the company doctor and missed four days of work. His back pain returned years later, and one of his hips is higher than the other which puts additional pressure on his back. He used marijuana and alcohol and now smokes a pack of cigarettes per day. He twice spent time in jail, the first time for ten days and the second time for eight days. He lost his driver's license and will remain on probation for the next four and a half years. He received treatment in St. Anthony's thirty-day program and has been to Southeast Missouri Community Treatment Inpatient Center once or twice. He has no insurance and no financial resources and takes no medication. (Tr. 212-13.)

Dr. Walker noted that plaintiff's hygiene and grooming were barely adequate and that he smelled strongly of wood smoke. She further reported that plaintiff mumbled some, which she attributed to dental problems, and had to be asked to repeat himself. She recorded that he moved slowly and that his affect and mood were depressed. Plaintiff informed Dr. Walker that his sleeping problems consisted of sleeping about six hours total and often falling asleep during the day. He reported depression, irritability and grouchiness. He informed Dr. Walker that he cannot tolerate being around people, including his children. Plaintiff has considered suicide but his religious beliefs dissuade him. Although he has attempted to make friends, plaintiff has none due to a lack of trust and discomfort with being around people. Plaintiff enjoys westerns and when he drank, he drank alone. (Tr. 213-14.)

Dr. Walker diagnosed plaintiff with dysthymic disorder, alcohol abuse that may be in partial remission, and schizoid personality disorder.[5] She further found that he was able to understand and follow simple directions and that his ability to attend and concentrate was fair. Dr. Walker additionally found that he had social problems in that he was uncomfortable with people and had turned to alcohol to help him in that area and that he was able to handle his own funds with the stipulation that he might need some oversight to prevent alcohol purchases. Dr. Walker also found plaintiff's intelligence in the borderline to low average range and his memory to be good. Dr. Walker assigned plaintiff a GAF score of 56.[6] (Tr. 214.)

From February 18, 2010, until November 16, 2010, plaintiff received additional care at Southeast Missouri Community Treatment Centers, Inc. It was noted that plaintiff suffered from major depression and a learning disability. (Tr. 245-50.)

On March 1, 2010, James Spence, Ph.D., completed a Psychiatric Review Technique of plaintiff. Dr. Spence evaluated plaintiff and additionally considered Dr. Walker's evaluation. Plaintiff informed Dr. Spence that he performs housework, launders, and cooks. Plaintiff additionally told Dr. Spence that his only hobby was watching television, that he spends no time with others, and that he lived with his mother and stepfather. Plaintiff further stated that he cannot get along with others and sometimes

---

[5] Dysthymic relates to dysthymia, a chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness. Stedman at 602.

[6] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.
  A GAF score from 51-60 represents moderate symptoms (such as flat affect and circumstantial speech, and occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as having few friends, and conflicts with peers or co-workers). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed.2000).

feels like killing someone. He can follow directions but does not always get along with authority figures and co-workers. Dr. Spence found plaintiff's statements partially credible. Dr. Spence diagnosed plaintiff with dysthymic disorder, schizoid personality disorder, and alcohol abuse. (Tr. 220-23.)

Dr. Spence additionally performed a Mental Residual Functional Capacity Assessment of plaintiff and found the following functional limitations: mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. Dr. Spence determined that plaintiff was moderately limited in his ability to understand and remember detailed instructions, his ability to carry out very short and simple instructions, his ability to maintain attention and concentration for extended periods, his ability to work in coordination with or in proximity to others without being distracted by them, his ability to interact appropriately with the general public, his ability to accept instructions and respond appropriately to criticism from supervisors, his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Dr. Spence concluded that plaintiff is capable of sustaining simple routine tasks away from the public. (Tr. 228-33.)

On April 1, 2010, Barry Burchett, M.D., completed an Internal Medicine Examination on plaintiff. Dr. Burchett examined plaintiff and considered the records of Dr. Bogaart. Plaintiff reported a five to six-year history of low back pain. Plaintiff described the pain as intermittent in the bilateral sacral region and worse on the right side. Plaintiff additionally complained of pain intermittently radiating down the right lower extremity to the calf, lasting for a few seconds at a time. Plaintiff stated that bending exacerbates his back pain but that sitting and applying ice provides some relief. Plaintiff further stated that he takes no medications for his back pain. Dr. Burchett diagnosed plaintiff with chronic low back pain without radiculopathy. (Tr. 238-43.)

On May 17, 2010, plaintiff applied for food stamps and disability benefits through the Missouri Department of Social Services. Plaintiff indicated that he suffered from back pain, problems with his L4-L5 disc, hip pain, and depression. Plaintiff stated that his back pain began four or five years ago and that his back pain and depression prevented him from working for the past two years. Plaintiff alleged the inability to walk long distances, or lift, or bend for long periods of time. Plaintiff further noted that he was able to care for himself, had received care at Southeast Community Treatment Center, and that he occasionally cried due to depression regarding his disability. The Department of Social Services issued denial letters on May 18, 2010 and September 22, 2010, stating that plaintiff failed to satisfy the requirements for state social services. (Tr. 254-60.)

On May 27, 2010, the Missouri Department of Social Services completed a medical report including physician's certification and disability evaluation. Plaintiff complained of low back pain due to twisting his back at work as well as shoulder and hand pain. He received diagnoses of degenerative disc disease of the back, osteoarthritis of the shoulder, anxiety, depression, and hypertension. The medical report also suggested that plaintiff suffered from carpal tunnel syndrome. It was recommended that plaintiff undergo an MRI of his back, an x-ray of his shoulder, and a nerve test on his wrist. (Tr. 261-62.)

On August 2, 2010, Robert Lander, M.D., of Washington County Memorial Hospital Rural Health Clinic examined plaintiff. Plaintiff complained of low back pain while walking and of pain in his hips that radiated into his right calf. Plaintiff rated the pain as five of ten. He reported taking Trazodone and smoking one pack of cigarettes per day.[7] Dr. Lander diagnosed plaintiff with an L5-S1 grade I spondylolisthesis with a vacuum effect at L4-5 and L5-S1 and with multilevel degenerative disk disease throughout the lumbosacral spine.[8] (Tr. 268.)

---

[7] Trazodone is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on August 28, 2013). Naprosyn is used to relieve pain. Id.

[8] Spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum. Stedman at 1813.

On August 2, 2010, plaintiff underwent x-rays of his lumbar spine at Washington County Memorial Hospital. The examinations revealed degenerative disc and facet disease of the mid and low lumbar spine. (Tr. 252.)

On March 9, 2011, Boonfu Boonyasai, M.D., examined and treated plaintiff. Plaintiff complained of back and hip pain lasting for at least six years and of coughing with shortness of breath lasting about three days. Plaintiff reported that his back pain made it difficult to walk. Dr. Boonyasai found plaintiff mentally slow and diagnosed him with severe degenerative arthritis of the lumbar spine. Dr. Boonyasai prescribed plaintiff with Cipro, Tylenol, and Naprosyn and ordered lab tests and x-rays of the lumbar spine, hips, and chest.[9] (Tr. 279-80.)

On March 10, 2011, lab tests and x-rays of plaintiff's hips, chest, and lumbar spine were taken at Iron County Hospital. X-rays of plaintiff's hips were negative. X-rays of plaintiff's chest revealed a left pleural effusion and an opacity in the left lower lung zone, which required follow up care and therapy. X-rays of plaintiff's lumbar spine revealed mild levoscoliosis and degenerative changes with degenerative disc disease of L4-L5 and L5-S1. (Tr. 283-86.)

On March 16, 2011, after reviewing the results of the aforementioned x-rays, Dr. Boonyasai again examined plaintiff. Plaintiff reported feeling somewhat better. Dr. Boonyasai diagnosed plaintiff with degenerative arthritis of the lumbar spine, hip pain, chronic obstructive pulmonary disease (COPD), and bronchitis, and further requested an MRI of plaintiff's lumbar spine.[10] (Tr. 280.)

---

[9] Cipro is used to treat a variety of bacterial infections. WebMD, http://www.webmd.com/drugs (last visited on August 28, 2013). Naprosyn is used to relieve pain. Id.

[10] Chronic obstructive pulmonary disease (COPD) is a long-term lung disease that refers to both chronic bronchitis and emphysema. WebMD, http://www.webmd.com/lung/copd/default.htm (last visited on August 28, 2013).

On March 18, 2011, an MRI was taken of plaintiff's lumbar spine at Open MRI of Washington County. The MRI revealed multilevel annular broad based disc bulges with accompanying left L3-L4 foraminal protrusion and right foraminal and lateral recess protrusion. The MRI additionally revealed resulting multilevel neural foraminal encroachment, which was most pronounced on the right at the L4-L5 level with mild to moderate transverse stenosis of the central canal at L4-L5. (Tr. 275-76.)

On March 30, 2011, plaintiff again followed up with Dr. Boonyasai. He complained of leg swelling in both legs lasting for almost a month and of difficulty breathing. Dr. Boonyasai diagnosed plaintiff with edema in both feet, congestive heart failure, tachycardia, COPD, back pain, and hip pain. Dr. Boonyasai ordered additional lab tests and x-rays of plaintiff's chest and prescribed Lanoxin, Lisinopril, and Lasix.[11] (Tr. 280-81.)

On March 30, 2011, lab tests and x-rays of plaintiff's chest were performed at Iron County Hospital. Results of the chest x-rays showed central congestion consistent with a component of congestive heart failure, small effusions, and that the opacity in the left lower lung zone was partially resolved. (Tr. 277-78.)

On April 7, 2011, plaintiff complained of back and hip pain. Dr. Boonyasai noted that plaintiff's ailments responded well to his prescribed medications. Notably, plaintiff's breathing and congestive heart failure improved. Dr. Boonyasai reviewed the MRI results and found that plaintiff had a disc protrusion and transverse stenosis of the central canal at L4-L5. (Tr. 281.)

On April 21, 2011, plaintiff informed Dr. Boonyasai that he was feeling better, breathing better, and able to walk further. Dr. Boonyasai noted that the swelling in plaintiff's legs had improved and that he responded well to treatment. Dr. Boonyasai continued plaintiff's medications and ordered additional lab tests, which were performed at Iron County Hospital on May 17, 2011. (Tr. 282, 287.)

---

[11] Lanoxin is used to treat heart failure. WebMD, http://www.webmd.com/drugs (last visited on August 28, 2013). Lisinopril is used to treat high blood pressure. Id. Lasix is used to reduce extra fluid in the body. Id.

On May 25, 2011, plaintiff reported to Dr. Boonyasai that he felt better, was breathing better, and that the edema was resolved. Dr. Boonyasai continued the Lisinopril and Lanoxin but decreased the strength of the Lasix prescribed to plaintiff. (Tr. 282.)

**Testimony at the Hearing**

The ALJ conducted a hearing on January 27, 2011. (Tr. 28-48.) Plaintiff testified to the following. Plaintiff is a 55-year old widower. He lives with his son, who transported him to the hearing. He dropped out of school in the tenth grade and never attained a GED, despite one attempt. He can read but has difficulty spelling. He was able to complete his own disability paperwork. Math is his best subject. (Tr. 30-31.)

He has not worked since August 15, 2008. He last worked as a janitor in a nursing home. He quit because lifting, carrying, walking, and other tasks became too much for him to handle and bothered his hip. The work history form that he filled out with his disability application probably contained inaccuracies. Three or four years ago he worked as a janitor for Ameren UE and often declined overtime opportunities because he could not perform the work. His duties consisted of sweeping and mopping the plant and removing normal sized trash bags weighing approximately fifteen pounds, which were the heaviest things he had to lift while employed for Ameren. On one occasion he nearly quit due to the left hip problems he experienced while walking, which is still his biggest problem. He is unable to walk very far without pain and cannot mow grass with a push mower. Occasionally, standing causes him pain, but, generally, he does not experience pain, except during physically intensive work or long walks. Plaintiff is able to stand long enough to wash a sink of dishes, though it causes him pain. He can lift twenty pounds at most, and he could perform such lifts three or four times per day, five days per week. (Tr. 32-38.)

Plaintiff attributes his lack of medical care to lack of insurance. His application for Medicaid was denied. He takes over-the-counter pain medication when he can afford it. He smokes cigarettes and provides his son very little help with household chores. Plaintiff

does not vacuum, sweep, mop, wash dishes, launder, shop, or perform yard work. Occasionally, he is able to make a sandwich on his own. He does not attend church or other social events and has no friends. (Tr. 38-40.)

Plaintiff previously worked for Wal-Mart Tire and Lube Express changing oil and tires. The heaviest thing he lifted was tires. He quit because he hurt his back. He twice visited the emergency room at Jefferson Memorial due to back pain. He received x-rays but was not admitted to the hospital during these visits. When he applied for Medicaid he was sent to Washington County Memorial Hospital, where he was diagnosed with degenerative discs. He previously saw three different chiropractors but no longer needs to see them because, since he quit working, injury is less likely to occur. (Tr. 40-44.)

Vocational expert (VE) Steven Kuhn also testified at the hearing. The VE testified that plaintiff worked as an automotive mechanic helper, which is heavy, semi-skilled work; a hand packer, which is medium, unskilled work; an industrial truck operator or forklift operator, which is medium, semi-skilled work; a production assembler, which is medium, unskilled work; and a general cleaner, which is medium, semi-skilled work. The ALJ presented a hypothetical question concerning an individual who is capable of performing medium work. The VE testified that plaintiff could perform all past jobs at the medium physical exertion level but not the automotive mechanic helper, which is heavy work. (Tr. 44-46.)

The ALJ presented a second hypothetical question to the VE concerning an individual who could perform medium work with only simple, routine, and repetitive tasks and only occasional interaction with the public. The VE testified that such individual could perform work as a hand packer and assembler. (Tr. 46.)

The ALJ presented a third hypothetical question to the VE concerning an individual with the limitations presented in the second hypothetical that would additionally miss work three or more times per month due to physical and mental symptoms. The VE testified that such an absenteeism rate generally precludes work in the national economy. (Tr. 46-47.)

## III. DECISION OF THE ALJ

On February 15, 2011, the ALJ issued a decision that plaintiff was not disabled. (Tr. 13-21.) At Step One of the prescribed regulatory decision-making scheme,[12] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, August 15, 2008. At Step Two, the ALJ found that plaintiff's severe impairments included degenerative disc disease of the lumbar spine, depression, and alcohol abuse in at least partial remission. (Tr. 15.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 15.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform medium work, except he is limited to simple, routine, repetitive tasks that involve only occasional interaction with the public. At Step Four, the ALJ found plaintiff able to perform past relevant work as a hand packer and an assembler. (Tr. 16-20.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because

---

[12] See below for explanation.

the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating he is no longer able to return to his PRW.  Pate-Fires, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues that the ALJ's determination of RFC for medium work is not supported by substantial evidence in light of the new and material evidence submitted to the Appeals Council following the ALJ's unfavorable decision.

Residual functional capacity is the ability of a claimant "to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998). Residual functional capacity is a medical determination. Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Some medical evidence must support the RFC determination. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ found that plaintiff had the RFC to perform medium work. (Tr. 16.) Medium work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. 20 C.F.R. § 404.1567(c). Social Security Ruling 83-10 further provides that "A full range of medium work requires standing or walking, off and on, for a total of approximately six hours in an eight-hour workday in order to meet the requirements of frequently lifting or carrying objects weighing up to twenty-five pounds."

Dr. Burchett's April 1, 2010 opinion supports the ALJ's RFC determination. While Dr. Burchett diagnosed plaintiff with chronic low back pain without radiculopathy, he further noted that plaintiff's spinal range of motion was normal, straight leg raise testing was negative, there was no tenderness or spasms in his back, and there was no evidence of compressive neuropathy in his lower extremities. (Tr. 241.) Dr. Burchett also reported that plaintiff did not require the use of a cane or handheld assistive device, was able to stand on one leg at a time without difficulty, ambulated with a normal gait, was able to walk on his heels and toes, and was able to perform tandem gait and squat without difficulty. (Tr. 239-40.) Additionally, during the hearing, plaintiff testified that he could possibly lift twenty pounds three to four times per day, five days per week. (Tr. 38.)

After the ALJ's decision, plaintiff submitted additional medical evidence to the Appeals Council. (Tr. 275-87.) The Appeals Council considered the additional evidence but ultimately determined that it did not provide a basis for overturning the ALJ's decision. (Tr. 1-2.) "When the Appeals Council has considered new and material evidence and declined review, we must decide whether the ALJ's decision is supported by

substantial evidence in the whole record, including the new evidence." Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000). At first glance, Dr. Boonyasai's records of visits between March 9, 2011 and May 25, 2011, appear to address the ALJ's concerns regarding plaintiff's lack of treatment and strong medication. However, Dr. Boonyasai only prescribed plaintiff pain medication during his first visit and over the course of his treatment with Dr. Boonyasai, plaintiff's condition improved. (Tr. 279-82.)

Generally, a treating physician's opinion is given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" on the record or not inconsistent with the overall assessment of that particular physician. Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) (quoting C.F.R. § 404.1526(d)(2)). However, upon reviewing plaintiff's MRI, Dr. Boonyasai diagnosed plaintiff with a bulging disc and stenosis but made no further mention of plaintiff's back pain or diagnosis during subsequent visits. (281-82.) Furthermore, aside from repeating what was detailed in the MRI report, Dr. Boonyasai made no statement indicating that plaintiff's back condition was any more restrictive than Dr. Burchett had earlier indicated and never opined on plaintiff's disabled status. (Tr. 279-82.) "That a physician did not "submit . . . a medical conclusion that [the claimant] is disabled and unable to perform any type of work" is a significant factor for the ALJ to consider." Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000). The ALJ relied on the opinion of Dr. Burchett, who also personally examined and performed tests on plaintiff, in making his RFC determination. Dr. Boonyasai's records do not conflict Dr. Burchett's opinion, and Dr. Burchett's opinion still constitutes substantial evidence upon which the ALJ could base his RFC determination.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Section 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 28, 2013.